Errol H. Stambler, Esq.
10880 Wilshire Blvd., Suite 1050
Los Angeles, California 90024
O:     (310) 473-4525
F:     (310) 475-8187
Email:estambler@msn.com
California State Bar Number: 58374

Party for: GORDON DRIVER

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| THE UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| PLAINTIFF, | ) | CV:   19-01928 |
| | ) | CR:   12-CR-00967-JAK |
| V. | ) | |
| | ) | REPLY TO THE OPPOSITION |
| GORDON DRIVER, | ) | (TRAVERSE) |
| | ) | Judge John A. Kronstadt |
| DEFENDANT. | ) | Date: February 28, 2023 |
| _____ | ) | |

TO THIS HONORABLE COURT:

Through his attorney, Errol H. Stambler, Defendant Gordon Driver files the reply to the

Government's opposition to Mr. Driver's Writ of Habeas Corpus for Ineffective Assistance of

Counsel.

Dated: February 27, 2023          Respectfully submitted,


                                  _____/s_____

                                  Errol H. Stambler

                                  Attorney for Mr. Driver

1 | P a g e

Memorandum

1.

Immigration Consequences

Looking through the exhibits filed by the Government1:

Exhibit 6 – emails dated March 16, 2015 – makes no reference to "aggravated felony" or mentions immigration consequences other than treaty transfer. With respect to treaty transfer, that has absolutely nothing regarding immigration aspects that are required under *Padilla vs. Kentucky,*.(2010) 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284.

Exhibit 7 – emails dated March 17, 2015, again does not refer to immigration consequences other than treaty transfer

Exhibit 8 – email dated March 30, 2015, again make no reference to any discussion as to immigration aspects other than, once again, treaty transfer.

Exhibit 13 – email dated April 3, 2015, no mention of immigration consequences.

The comprehensive letter to Mr. Driver from attorney Histed – only discusses possible treaty transfer and does not mention immigration consequences – let alone the "aggravated felony" count pled.

In contrast, the attorneys (Histed, Quinn, and Eaglin) said that they, in fact, orally told Mr. Driver of the immigration consequences of an aggravated felony. But all the written documents do not reference the immigration consequences, let alone the aggravated felony. Simply put, there is no corroborating evidence (notes or otherwise) that what they say actually occurred.

Addressing the responsibility of criminal defense counsel to advise clients about immigration consequences, *Padilla* held, first, that because of the "unique nature of deportation" and "recent changes in our immigration law [that] have made removal nearly an automatic result for a broad class of noncitizen offenders," "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel." 130 S.Ct. at 1481-82. Next, *Padilla* defined the scope of a criminal defense attorney's duty to advise his noncitizen client about the immigration consequences

---

1 Cites are in reference to Marked Exhibits by the Government and attached here as Exhibit A of the Petitioner

of a guilty plea:

> When the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the "deportation consequence" is evident, as in this case, the duty to give correct advice is equally clear. *U.S. v. Bonilla* (9th Cir. 2011) 637 F.3d 980, 983

In a similar case, *United States v. Ruiz* (9th Cir. 2013) 548 F. App'x 410, the court held that, "given the aggravated felony nature of the offense Ruiz pled to, our interpretation of *Padilla* required that Ruiz be informed not that she might face deportation," but that her deportation was a virtual certainty. See *Bonilla*, 637 F.3d at 984 ("A criminal defendant who faces almost certain deportation is entitled to know more than that it is possible that a guilty plea could lead to removal; he is entitled to know that it is a virtual certainty." (citing *Padilla,* 559 U.S. at 369)).

The attorneys, in Mr. Driver's case, notes reflect no mention that any of the attorneys sought a non-aggravating fraud count. The Government makes reference that even if Mr. Driver pled to a non-aggravating count (count two), the immigration consequences would still result in mandatory deportation. **That is not correct.** The immigration courts look at the count pled to and not to the counts not pled. (see Exhibit B, Declaration of Mathew Millen of the memorandum of law filed as Document 11, in 2:19-cv-01928-JAK)

Clearly, the loss amount that Mr. Driver pled to exceeded the $10,000, resulting in an "aggravating felony," whereas, as stated before, there were no apparent negotiations for a non-aggravating count. In fact, it is suspected that none of the attorneys ever considered such when representing Mr. Driver.

Once again, other than the reflections of their memory, the attorneys stated they informed Mr. Driver that he was pleading to an aggravated felony and that his deportation upon service of his custodial time would be mandatory. None of the emails, letters, or other documents state or refer to such absolutes. None of the documents submitted by the Government refer to "aggravated felony." They refer to treaty transfer only!

What is treaty transfer? According to the Government, it is required for the Government to agree to such and that Canada accept such inmates to complete their term there. The concept of treaty

**3 |** P a g e

1  transfer applied to Mr. Driver was an illusion driven by his attorneys! The Government would not

2  agree to such –made clear by the Government's argument in their opposition. Therefore, there would

3  be no treaty transfer. It is argued that this was another persuasion for Mr. Driver to accept the plea

agreement that he would plead to a count of conviction with the possibility of treaty transfer, which

4  was invalid and untrue. Mr. Driver pled to an aggravated felony that required mandatory deportation,

5  and the Government would not agree to a treaty transfer, and his attorneys well knew this.

6          The Government, on their opposition page 20, lines 4-8) that Histed believed that Mr. Driver

7  would be at the mercy of Homeland Security. Mr. Histed states that he "believed" that Mr. Driver

8  knew he would be deportable. Regarding the statement, Mr. Histed is correct that he would be at the

9  mercy of Homeland Security – but fails to mention the keyword "mandatory" since Mr. Driver's count

of conviction is an aggravated felony and not a non-mandatory felony.

10         Mr. Eglin states that he informed Mr. Driver that he was pleading for an aggravated felony.

11  (Government's opposition page 21, lines 9-10) yet none of such is mentioned in his recorded interview

12  with the late Alfredo Rasch. (See Exhibit H, Document 11 of Petitioner's memorandum)

13         The Government argument is thus: The mere declaration of Gordon Driver should be ignored

14  as a post-conviction self-serving statement. However, is it not to be said that, likewise, the three

15  attorneys who now recall that they did advise Mr. Driver of the consequences for pleading to an

16  aggravated felony? The Government concedes that attorney Histed's letter omitted any mention of

immigration consequences and failed to mention the mandatory aspect of pleading to an aggravated

17  felony instead of a non-aggravating felony of $10,000 or less.

18         Another apparent factor in the Government's opposition is that the Government itself fails to

19  state that at no time did counsel for Mr. Driver ask them (i.e., the Government) to plead to a

20  non-aggravating felony count. Instead, the attorneys for Mr. Driver never brought up Padilla in order

21  to search of a none mandatory count. This failure by defense counsel to attempt to negotiate a different

22  count is ineffective assistance of counsel under Padilla.

23                                    Relevant Conduct

24         The Government is correct in using American Banks to funnel money from outside the United

25  States in relation to the fraud committed within the United States. However, the Government's theory

26  **4 | P a g e**

27

28

must be based on two factors:

      1.  The discovery of United States Banks was provided to the defense and

      2.  That the court used the proper standard of "relevant conduct."

The Standard to be Used For the Application of Relevant Conduct the Courts have stated, in various cases:

Here, the "relevant conduct" alleged by the Government will increase Carbone's base offense level from 12 to 28. Under factor 5 of the disproportionate impact test, an increase in levels of four or more necessitates proving the underlying facts by clear and convincing evidence. *U.S. v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000). The testimony in this case of relevant conduct must be considered under a clear and convincing evidence standard. *United States v. Carbone* (*Memorandum* of Chief Judge Nye, Dist. of Idaho 20-CR-00237, p.2

For example, The Ninth Circuit held that the inclusion of the food stamp theft in the loss calculation increased the number of offense levels by six, and Huihui's enhanced sentence is more than double the maximum length authorized without the enhancement. These are two factors that justify requiring clear and convincing evidence of the conduct underlying the sentence enhancement. See *United States v. Jordan*, 256 F.3d 922, 928 (9th Cir.2001*). U.S. v. Huihui* (9th Cir. 2002) 51 F. App'x 219, 220

To date, we have applied the disproportionate impact test only in the case of sentence enhancements. See, e.g., *United States v. Bonilla-Montenegro*,331 F.3d 1047, 1050 (9th Cir. 2003) (clear and convincing standard applies where 16-level enhancement increased defendant's sentencing range from 6 to 12 months to 63 to 78 months); *United States v. Mezas de Jesus*,217 F.3d 638, 642-44 (9th Cir. 2000) (clear and convincing standard applies where 9-level enhancement for uncharged conduct increased defendant's sentencing range from 21 to 27 months to 57 to 71 months); *Jordan*, 256 F.3d at 929 (clear and convincing standard applies where 9-level enhancement increased defendant's sentencing range from 70 to 87 months to 151 to 188 months). *U.S. v. Gonzalez* (9th Cir. 2004) 365 F.3d 796, 799

In Mr. Driver's case, the guidelines were increased from a base level of 7 to 37 offense level. This increase was basically using the Canadian investors – both number and loss amounts. Therefore,

the standard to be applied is "clear and convincing." Furthermore, the increase far exceeds the base level of 7.

Looking over the discovery provided for this writ, Exhibit D2 of the Government is 39 pages of Excel. Showing investors deposits and withdraws. However, this Excel exhibit does not indicate the bank or the checks– just names and numbers. Furthermore, no emails, letters, or notes from the defense suggest that such was not even provided to the defense other than to the Petitioner at this stage of the Writ of Habeas Corpus. Finally, it should be noted that in the audio interviews of Mr. Driver's attorneys, not one mentioned having the bank records that the Government now argues are sufficient for jurisdictional evidence.

There is no indication from the defense or the Government argument that the "clear and convincing" standard of evidence and finding required under the law was applied at the time of sentencing.

Loss Application3

Moreover, the Government asserted that Mr. Driver's "primary place of business" during the 2006-2009 schemes was Canada, not the U.S. PSR, ¶ 34. Because the Government contended the fraud was a Ponzi scheme, PSR, ¶¶ 39, 58, it necessarily contended that Mr. Driver's intent was purposefully not to avail himself of American securities and commodities markets but instead to pay new investors' "returns" with older investments. The Government alleged that, while he was in Canada, approximately 92% of Mr. Driver's scheme was to take some Canadian investor money and shift it to newer Canadian investors. That does not entail injury to American markets qua markets. As the court noted, in this Circuit, it is a sentencing error to "apply the defendant's foreign conduct to the [offense] level calculation" via "relevant conduct." *United States v. Chao Fan Xu*, 706 F.3d 965, 992 (9th Cir. 2013). In Chao Fan Xu, several Chinese nationals defrauded their employer, the Bank of China, granting themselves tens of millions in unauthorized loans (706 F.3d at 972.) Before the bank caught them, the defendants obtained fraudulent U.S. visas, laundered proceeds through American

---

2  Petitioner is not sure if Exhibit D was not submitted to the court in the argument for the application of "relevant conduct" nor is Petitioner sure if Exhibit D was authenticated as being correct.
3  This Argument was stated in the "Compassionate Release Petition to the court and is adopted for this Traversal.

casinos, and fled to the U.S. Among other charges, the defendants were convicted of RICO conspiracy, with the underlying predicate offense being money laundering. (706 F.3d at 992) They challenged their convictions and sentences on Morrison-extraterritoriality grounds. The Ninth Circuit affirmed the convictions but vacated the sentences under Morrison's principles. The district court had sentenced the defendants under USSG §2S1.1(a)(1), which directs courts to calculate that if a money laundering base offense level with "the offense level for the underlying offense from which the laundered funds were derived" if the defendant committed the underlying offense or would be accountable for the underlying offense as "relevant conduct." 706 F.3d at 992 (quoting USSG §2S1.1(a)(1)). As here, the "underlying offense" in Chao Fan Xu was a fraud, id., so the district court's calculation of the offense level contemplated including foreign national losses, i.e., losses to the Bank of China. 706 F.3d at 992. Although the RICO conviction survived Morrison's scrutiny, the Ninth Circuit held it was still sentencing error to "apply the defendants' foreign conduct to the base level calculation." Here, the Defendants were Chinese nationals who committed fraud against the Bank of China while on Chinese soil. The fraudulent proceeds were later laundered through [a bank account] and brought into the United States. However, the Defendants' bank fraud only indirectly affected the United States. Put another way, the connection between the Defendants' bank fraud and the United States is too attenuated to be considered when calculating a base offense level. By contrast, the Defendants' immigration fraud directly impacted United States' interests, and thus it is properly considered domestic conduct that does not implicate the same relevant conduct concerns. *Chao Fan Xu*, 706 F.3d at 992 (emphasis added). The Second Circuit is in accord. *United States v. Azeem*, 946 F.2d 13, 17 (2d Cir. 1991) ("To permit foreign crimes to figure in fixing the base offense level would require courts to perform a careful comparative analysis of foreign and domestic law in such instances . . .[we] decline to create the complexities that the inclusion of foreign crimes in the base offense level calculation would generate."); *United States v. Chunza-Plaza*s, 45 F.3d 51, 57-58 (2d Cir. 1995) (same). That concern was realized here: Canadian authorities declined to bring criminal charges against Mr. Driver even though about 92% of the investors were Canadian nationals. Mr. Driver's offense level calculation thus exceeded the permissible custodial time imposed. Here the United States punished Mr. Driver for actions that a Sovereign Country (Canada) refused to prosecute.

7 | P a g e

1        It is therefore requested that this court hold an evidentiary hearing for any findings that

2   increase the sentence imposed upon Mr. Driver.

3

4   Dated: February 27, 2023                  Respectfully submitted,

5

6                                 _____/s_____

7                                 Errol H. Stambler

8                                 Attorney for Mr. Driver

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   **8 |** P a g e

27

28